## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIE TYRONE TROTTIE, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  4:09-0435 |
| | § | |
| RICK THALER, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Willie Tyrone Trottie is a Texas death row inmate.  This case is before the Court on Trottie's Second Amended Petition for Writ of Habeas Corpus (Doc. # 33), Respondent Rick Thaler's Motion for Summary Judgment (Doc. # 44), and Trottie's Cross-Motion for Summary Judgment (Doc. # 49).  Having carefully considered the Petition, the Summary Judgment Motions, all the arguments and authorities submitted by counsel, and the entire record, the Court is of the opinion that Thaler's Motion for Summary Judgment must be **granted**, and Trottie's Second Amended Petition for Writ of Habeas Corpus and Cross-Motion for Summary Judgment should be **denied**.

I.    **BACKGROUND**[1]

Trottie and Barbara Canada met and began dating in 1989 or 1990, and soon began living together.  In September 1992, Barbara left Trottie and moved in with her parents. Trottie threatened to kill Barbara if she did not return to him, and repeated the threat several times over the following months.

In April 1993, Trottie phoned Barbara and told her that he would kill her if she did not return to him by May 1.   On May 3, Trottie called Barbara again and told her that her time was up and he intended to kill her and her brother Titus (because, he claimed, Titus kept Barbara from seeing him).  At approximately 11:00 that night, Trottie forced his way into the Canada residence and began firing a semiautomatic 9mm pistol.  He immediately shot Barbara's mother, sister, and Titus.  Titus was wounded, but returned fire, hitting Trottie three times.  Though wounded, Trottie cornered Barbara in a bedroom and shot her 11 times, stating:  "Bitch, I told you I was going to kill you."  Barbara died instantly.  Trottie then returned to the living room where Titus was lying wounded.  In the view of at least two small children, Trottie fired two shots into the back of Titus's head, killing him.  Trottie left, and was arrested a short time later in the emergency room of a nearby hospital.  The jury found Trottie guilty of capital murder for murdering Barbara and Titus Canada during the same criminal transaction.

---

[1]    The facts of the case are largely undisputed and drawn are from the opinion of the Texas Court of Criminal Appeals ("TCCA") affirming Trottie's conviction and sentence.  *See Trottie v. State*, No. 71,793 (Tex. Crim. App. Sept. 20, 1995) ("Trottie Appeal Op.").  Where this opinion diverges from, or expands upon, the TCCA's recitation of facts, such difference will be noted by a specific citation to the record.

During the penalty phase, the State presented evidence that in 1988, Trottie pled guilty in Louisiana to theft of property valued at less than $100.  In July 1990, he was arrested in Texas for unlawfully carrying a weapon.  He pled guilty to that crime, as well.  In September 1990, Trottie was convicted of theft in Texas and placed on probation.  He violated a condition of the probation in February 1993.  In October 1992, Trottie shot out the tires on Barbara Canada's car.  The TCCA also noted that the evidence from the guilt/innocence phase established that Trottie unlawfully carried a handgun, and that the capital murder of Barbara and Titus Canada "was both premeditated and extreme."  Trottie Appeal Op. at 1-5.

Van Curry testified that he worked with Trottie for six years through the Young Professionals of Houston program.  Trottie got work as a security guard through the organization and, in exchange, did volunteer work for the organization.  Curry testified that Trottie worked with children through the program and they had a good experience.  Trottie had a positive attitude and Curry was impressed with Trottie's leadership.  22Tr. at 124-26.[2]

Trottie's mother and sister testified about Trottie's childhood.  They testified that Trottie's parents stopped living together when Trottie was five years old.  At first, the children lived with their mother.  Shortly after the parents separated, Trottie's mother took the four youngest children to a motel where their father lived and told the children to wait for their father on a motel room doorstep.  The oldest of the four children was nine years old.  Trottie, the second oldest, was eight.  After waiting for about 10 minutes, the children went to a grocery store because they were hungry.  Store employees caught them stealing food,

---

[2]      "Tr." refers to the transcript of Trottie's trial.

but then gave the food to them.  The police eventually picked the children up and they were placed in foster care.  Trottie ran away from his foster homes several times to try to find his mother or grandmother.  *Id.* at 132-46.  The defense also established that Trottie had no disciplinary problems in jail.  *Id.* at 152-56.

Lynn Clark, Trottie's probation officer, testified that Trottie brought his nephew to see Clark because Trottie was concerned that the nephew was becoming involved with drugs. Trottie wanted Clark to tell his nephew about the criminal justice system, and help him get help for his drug use.  *Id.* at 166.

Dr. Priscilla Ray testified that Trottie needed therapy and medication for depression and issues with abandonment.  She also observed that Trottie might have strong reactions to rejection or abandonment by women because of his experiences in childhood.  She opined that Trottie's abandonment by his mother may have played a part in his violent reaction to Barbara's rejection.  During interviews, Trottie was remorseful.  Dr. Ray also testified that she did not feel threatened by Trottie, and opined that he could become a productive member of society with treatment for depression.  *Id.* at 172-77.

Based on this evidence, the jury found that there was a probability that Trottie would commit future acts of criminal violence constituting a continuing threat to society, and that the mitigating evidence was insufficient to warrant a life sentence.  Accordingly, the trial court sentenced him to death.

The TCCA affirmed Trottie's conviction and sentence. *Trottie v. State*, No. 71,793 (Tex. Crim. App.  Sept. 20, 1995).  Trottie filed his state application for a writ of habeas

corpus on August 18, 1997.  On July 10, 2008, the trial court submitted findings of fact and

conclusions of law recommending that relief be denied.  SH at 324-49.[3]  The TCCA adopted

the findings and conclusions and denied relief on February 11, 2009.  *Ex Parte Trottie*, No.

70,302-01 (Tex. Crim. App. Feb. 11, 2009) ("State Habeas Op.").

Trottie filed his initial federal petition for a writ of habeas corpus on February 13,

2009.  He amended the petition on September 14, 2009, and March 4, 2010.  Respondent

answered the second amended petition and moved for summary judgment on December 20,

2010.  Trottie responded and cross-moved for summary judgment on August 17, 2011.

## II.    APPLICABLE LEGAL STANDARDS

### A.    The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas corpus relief is governed by the applicable provisions

of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v.

Garceau*, 538 U.S. 202, 205-08 (2003); *Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).

Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the

merits by the state courts cannot be granted unless the state court's decision (1) "was contrary

to, or involved an unreasonable application of, clearly established federal law, as determined

by the Supreme Court of the United States" or (2) "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002);  *Kitchens v. Johnson*, 190 F.3d

698, 700 (5th Cir. 1999).

---

[3]      "SH" refers to the transcript of Trottie's state habeas corpus proceedings.

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005). Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)), *cert. denied*, 532 U.S. 915 (2001)).

The "unreasonable application" standard permits federal habeas corpus relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on

whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied* 537 U.S. 1104 (2003); *see also Pape v. Thaler*, 645 F.3d 281, 292-93 (5th Cir. 2011). The focus for a federal court under the "unreasonable application" prong is "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Neal*, 239 F.3d at 696, and *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'")

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2); *Martinez v. Caldwell*, 644 F.3d 238, 241-42 (5th Cir. 2011). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998). This Court may only consider the factual record that was before the state court in determining the reasonableness of that court's findings and conclusions. *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388 (2011). Review is "highly deferential," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*), and the

unreasonableness standard is "difficult [for a petitioner] to meet." *Harrington v. Richter*, 562 U.S. ___, 131 S.Ct. 770, 786 (2011).

### B.    Summary Judgment  Standard in Habeas Corpus Proceedings

In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts of the case in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).  This principle is limited, however; Rule 56 applies insofar as it is consistent with established habeas practice and procedure.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (citing Rule 11 of the Rules Governing Section 2254 Cases).  Therefore, § 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party.  *See id*.  Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" regarding the state court's findings of fact, those findings must be accepted as correct.  *See id*.  Thus, the Court may not construe the facts in the state petitioner's favor where the prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness in 28

U.S.C. § 2254(e)(1) should not apply.  *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983);

*Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D.

Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998).

## III.    ANALYSIS

Trottie's petition raises ten claims for relief, including subclaims.  They are addressed

in turn below.

### A.    Ineffective Assistance Of Counsel

Trottie raises eight claims of ineffective assistance of counsel:  (1) counsel provided

no guidance regarding competency and sanity evaluations; (2) counsel failed to present

witnesses to explain Trottie's ongoing relationship with Barbara Canada and rebut the State's

contention that the crime was premeditated; (3) counsel failed to present mitigating evidence

that Trottie's mother was abusive and an alcoholic; (4) counsel failed to investigate until very

shortly before trial;[4] (5) counsel failed to rebut evidence of extraneous offenses; (6) counsel

failed to present evidence that the black clothing he wore on the night of the murder was his

security guard uniform; (7) counsel failed to challenge inconsistencies in the State's case; and

(8) counsel failed to challenge jurors predisposed toward a death sentence.

To prevail on a claim for ineffective assistance of counsel, Petitioner "must show that

. . . counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment," and "the deficient performance prejudiced the

---

[4]    Trottie also claims that counsel met with him only twice before trial.  Respondent does not
separately address this claim, but apparently groups it with the general failure to prepare
claims.

defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to prevail on the first prong of the *Strickland* test, the "deficient performance" prong, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances, avoiding the distorting effects of hindsight. Review of counsel's performance is deferential, and counsel enjoy a strong presumption that their conduct is within the bounds of professional norms. *Id.* at 688-90. To prove "prejudice" under the *Strickland* test, there must be a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 687.

### 1.    **Procedural Default**

Respondent argues that Trottie never raised these specific claims of ineffective assistance of counsel in state court. The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(I) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). As the Fifth Circuit explained in a pre -AEDPA case, federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as factual allegations supporting those grounds. "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." *Orman v. Cain*, 228 F.3d

10

616, 619-20 (5th Cir. 2000).  This rule extends to the evidence establishing the factual allegations themselves.  *Pinholster*, 131 S.Ct. at 1398.  In addition, the Supreme Court has found that not only must a petitioner present the state court with his claim, but he must also alert the state court of the constitutional nature of the claims. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.").

A petitioner fulfills the exhaustion requirement if "all crucial factual allegations were before the state courts at the time they ruled on the merits" of the habeas petition.  *Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir. 2000). Review is limited to the record that was presented to the state courts.  *Pinholster*, 131 S. Ct. 1388.

In his state habeas application, Trottie alleged that counsel failed to investigate and present defense and mitigation witnesses, though several were available to testify.  These included Trottie himself (he specifically contended that counsel failed to properly advise him of his right to testify), Theotis Holmes, Tonya Baul, and Patrice Espree.  He also claimed that counsel failed to present evidence that Titus Canada previously threatened Trottie with a gun which, Trottie alleged, explains why he was armed when he entered the Canada residence. He further contended that counsel should have presented evidence and sought jury charges supporting a defense of sudden passion – thereby reducing the crime to manslaughter – or to argue self-defense or other lesser included offenses.  Trottie claimed that counsel was ineffective for failing "to properly preserve the 'constitutional argument' regarding the trial

court's admission into evidence of the 'fact' that [Trottie] 'shot someone in self-defense in March 1990.'"  SH at 48.

Nowhere in his state application or appellate brief does Trottie contend that counsel were ineffective for failing to provide guidance regarding competency and sanity evaluations, that counsel failed to investigate until very shortly before trial, failed to present evidence that the black clothing he wore on the night of the murder was his security guard uniform, failed to rebut evidence of extraneous offenses,[5] failed to present evidence that Trottie's mother was abusive and an alcoholic, failed to challenge inconsistencies in the State's case, or failed to challenge jurors predisposed to a death sentence.   These claims are therefore unexhausted.

Trottie's state habeas application did raise a general claim that counsel failed to prepare or present a defense, specifically claiming that counsel could have argued self-defense based on a past altercation with Titus, or presented a sudden passion defense. He did not claim, as he does here, however, that counsel should have presented evidence that he and Barbara had an ongoing relationship up until the time of the murders,[6] or that counsel conducted only an "eleventh hour" investigation.  Nowhere does Trottie's state habeas

---

[5]     In his state habeas application, Trottie argued that counsel failed to preserve a constitutional objection to the admission of extraneous offense evidence.  He did not claim that counsel was ineffective for failing to rebut the evidence.  *See* SH at 48-49.

[6]     Trottie submitted affidavits from uncalled witnesses who said that they had information concerning "the circumstances surrounding Willie Tyrone Trottie's relationship with  . . . Barbara Canada and his arrival at Ms. Canada's house on May 3, 1993 . . . ."  *See*  SH at 195-99.  This vague and general statement, repeated in all three affidavits, clearly does not state that Trottie and Barbara had an ongoing social relationship up to the time of the murders.

application cite to notes in the attorneys' files to support the claim that counsel did not adequately review the State's file. Trottie's failure to argue these specific theories means that "all crucial factual allegations were [not] before the state courts at the time they ruled on the merits" of the habeas petition. *Dowthitt*, 230 F.3d at 746. These claims, too, are unexhausted.

The state application also does not complain that counsel met with Trottie only twice before trial. Trottie, however, cites to an affidavit he submitted that was dated 11 years after he filed his application, and roughly three months before the trial court entered its findings and conclusions, in which he makes this claim.

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims. *Rose v. Lundy*, 455 U.S. 509 (1982). Dismissal in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law. On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground. *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996). A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances. Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a) (Vernon Supp. 2002). The

Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1)    the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or

> (2)    by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

*Id.* The Texas Court of Criminal Appeals applies its abuse of the writ doctrine regularly and strictly. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (*per curiam*).

Petitioner does not claim that he could not have presented these claims in his direct appeal or his state habeas petition because the factual basis for the claims did not exist, or that he is actually innocent. Therefore, Petitioner's unexhausted claims do not fit within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts. *Coleman*, 501 U.S. at 735 n.1. That bar precludes this Court from reviewing Petitioner's claims absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice, *id.* at 750, *i.e.*, that he is actually innocent of capital murder or is legally ineligible for the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 336 (1992); *Dretke v. Haley*, 541 U.S. 386, 393 (2004). Petitioner makes no such showing. Therefore, this Court cannot review these claims.

### 2.    Actually or Debatably Exhausted Ineffective

### Assistance of Counsel Claims

#### a.      Failure To Meet With Trottie

Assuming that Trottie's claim that counsel met with him only twice before trial is properly exhausted, it does not entitle him to relief.  The bulk of Trottie's affidavit concerns his claim that counsel did not properly advise him of his right to testify, that he wished to testify on his own behalf at both phases of the trial, and his contention that counsel should have argued self-defense.  *See* Am. Pet. Exh. 30.  Trottie's brief statement that counsel met with him only twice acknowledges that counsel asked him to write down his version of events.  Other than listing some witnesses he claims he could have identified to counsel, and claims that he would have laid out his theory of self-defense for counsel, he does not identify any information he could have provided to counsel but did not.

Trottie's claim that counsel met with him only twice is contradicted by counsel's affidavit, in which counsel states that he met with Trottie "numerous times" and discussed potential witnesses with Trottie.  SH at 187, 189.  The state habeas court found counsel's statements credible.  SH at 327.  Counsel specifically disputes Trottie's assertion that he did not advise Trottie of his right to testify.  Counsel states that he offered his opinion on the wisdom of Trottie testifying, but left the decision to Trottie.  He also disagrees with Trottie's belief that his testimony would have changed the outcome.  SH at 189.  Based on the record before the state court, the state court's findings are not unreasonable.  This Court must therefore defer to those findings.

The record also shows that counsel subpoenaed at least three of the witnesses

15

identified in Trottie's affidavit.  Counsel stated in his state court affidavit that he recalled speaking to two of the witnesses and making a decision not to call them because he found them unhelpful.  He did not specifically remember the third witness, but stated that he would have called her to testify if he thought she was helpful.

As for Trottie's self-defense argument, the record already contains evidence that Titus fired the first shot, making much of the evidence Trottie seeks to add (cited in his affidavit) cumulative.  In any event, counsel made a strategic decision that a self-defense argument would not work in the face of evidence that:  (1) Trottie made repeated threats to kill Barbara if she did not return to him by May 1; (2) Trottie telephoned Barbara on May 3 and told her that he would not wait any longer and planned to kill her that day; (3) he entered the Canada residence on May 3 armed with a semiautomatic handgun; (4) he chased Barbara into a bedroom, shot her 11 times, and said "Bitch, I told you I was going to kill you"; and (5) he fired two fatal shots into Titus's head after Titus was wounded and incapacitated.

The state habeas court found that counsel made a reasoned strategic decision not to call the witnesses and that, because their testimony was cumulative of evidence presented at trial, there was no prejudice to Trottie.  SH at 344.  These conclusions are supported by the record.  In light of the overwhelming evidence that Trottie did not act in self-defense, and considering the substantial deference due both to counsel's strategic decisions, *see, e.g.,* *Strickland*, 466 U.S. at 681 (informed strategic decisions of counsel are entitled to great deference), and state court conclusions, there was no unreasonable application of controlling precedent here.

16

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is . . . difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' *id.,* at 689 [104 S.Ct. 2052]; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles* [*v. Mirzayance*]*,* 556 U.S., at ----, 129 S.Ct. [1411], at 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---- [129 S. Ct. at 1420].

*Premo v. Moore*, ___ U.S. __ 131 S.Ct. 733, 740 (2011).

### b.    Trottie's Clothing And His Relationship With Barbara Canada

Trottie now identifies two witnesses, Larry Dixon and Charles Ray Garrett, who claim that Trottie and Barbara in fact spent time together socially in the months preceding her death.  They also claim that Trottie wore a black uniform for a job as a security guard, explaining his black clothing on the night of the murders.  Trottie contends that these witnesses would have undermined the State's theory that the murders were planned and premeditated.  Trottie's state habeas application did not identify these witnesses, or make any such claim.  Rather, the state application made a generic claim that counsel failed to present mitigating evidence, and argued that counsel should have argued self-defense.

Trottie also argues that the State habeas court applied the wrong burden of proof to his ineffective assistance claims, that the decision was therefore unreasonable, and that he is therefore not barred from presenting new evidence in support of his claims.  Trottie confuses two separate issues.  Assuming for the sake of argument that the State court applied the wrong burden of proof, then it would constitute an unreasonable application of Supreme Court precedent, and the state court's conclusions would not be entitled to deference.  Here,

however, Trottie puts forward an entirely new theory of ineffective assistance of counsel, *i.e.*, that counsel should have discovered and presented evidence that he had an ongoing relationship with Barbara, and an alternative explanation for his clothing, that he never presented to the state habeas court. Trottie does not merely present new evidence in support of a prior claim, he presents entirely new factual claims. Regardless of whether the state court conclusion on the claims he did present was reasonable, his new claims are unexhausted and procedurally defaulted.

He also argues that AEDPA is inapplicable because the state habeas court did not write an opinion, but merely adopted the State's proposed findings of fact and conclusions of law. In particular, Trottie argues that the state habeas court failed to consider Trottie's argument that counsel were ineffective by failing to conduct an adequate investigation or to present certain mitigation witnesses. There is no requirement, however, that a state habeas court write an opinion. Regardless of whether the court wrote its own findings of fact and conclusions of law or adopted those submitted by a party, the question under the AEDPA is whether the findings and conclusions (1) were "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "w[ere] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). If they were not unreasonable based on the record and the controlling law, then they are entitled to deference under the AEDPA. The "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on

whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert.denied* 537 U.S. 1104 (2003).

As discussed elsewhere in this opinion, some aspects of Trottie's claim were presented to the state habeas court. The question for this Court is whether the state court's resolution of those claims was reasonable. Other aspects of Trottie's ineffective assistance claims were not fairly presented to the state courts because the factual basis of the claims was not presented. Instead, Trottie now attempts to argue that the absence of an opinion addressing the extremely vague state court allegations that counsel could have conducted more investigation or presented additional witnesses means that this Court can review these claims *de novo*. Again, as noted above, where Trottie did not present the specific factual basis of such claims, the new claims are unexhausted and procedurally defaulted.

### c.     <u>Failure To Present Mitigation Witnesses</u>

Among the generic claims raised in Trottie's state habeas application is a claim that counsel failed to interview, prepare, and present mitigation witnesses. The application itself identifies no such witnesses, but the affidavits of Theotis Holmes and Tonya Baul were attached to the application. An affidavit by an investigator relating possible testimony by Patrice Espree was also attached. The affidavits state in general terms that these witnesses could have testified about Trottie's relationship with Barbara. As noted above, the state habeas court found that counsel did interview at least two of these witnesses and made a strategic decision that they would not be helpful. This conclusion was reasonable and is

19

entitled to deference.

### 3.     Unexhausted Claims

Procedural default aside, Trottie would not be entitled to relief on his ineffective assistance of counsel claims.

#### a.     Failure To Provide Guidance In Psychological Evaluations

While Trottie contends that counsel failed to provide him with any guidance during competency and sanity evaluations, Respondent points out that the State did not use any statement Trottie made during these evaluations. Trottie claims that his statements allowed the State to formulate a "preemptive counter-theory of planning and premeditation." Pet. at 39. This contention ignores the ample evidence that the murders resulted from Trottie carrying through on a series of threats, that Trottie was armed when he entered the Canada residence, and that the State bore the burden of proving that Trottie intended to kill at least one of the victims. *See* TEX. PENAL CODE § 19.02(b)(1); § 19.03(a). Nothing in the record supports Trottie's speculative claim that statements he made during the evaluations led to the State's theory of the case. He therefore fails to prove *Strickland* prejudice.

#### b.     Failure To Call Witnesses At Guilt-Innocence Phase

To the extent that Trottie's claims regarding potential witnesses Baul, Holmes, and Espree pertains to the guilt-innocence phase, they are similarly unavailing. Trial counsel submitted an affidavit stating that he tried to point out that Barbara violated terms of the protective order she obtained against Trottie. He subpoenaed at least two of the witnesses Trottie identified, but made a strategic decision not to call them because he found them

20

unhelpful.  SH at 188.

The state habeas court found that counsel elicited testimony on cross-examination of several of the State's witnesses regarding Trottie's relationship with Barbara, his emotional and mental status at the time of the offense, and the events leading up to the murders. Specifically, Latrale Lott testified that Barbara met Trottie "a couple of times" after obtaining a protective order against him.  18 Tr. at 58-59.  Tyshan Baisey also testified that Barbara saw Trottie several times after obtaining the protective order.  *Id.* at 143-44.

In closing argument, counsel pointed to evidence that Trottie begged Barbara to stay with him, and emphasized the evidence that Barbara continued to see him even after obtaining the protective order.  Thus, the witnesses that Trottie now claims counsel should have called would have been cumulative of evidence in the record.  "[A]ny ineffective assistance claim must falter where the evidence to be discovered is so similar and cumulative that failure to find and present it would not prejudice the result."  *Skinner v. Quarterman*, 528 F.3d 336, 345 n.11 (5th Cir. 2008).

### c.    Failure To Present Mitigating Evidence

Trottie now presents affidavits from several relatives who state that his mother was an abusive alcoholic who did not care about her children and mistreated them, and that Trottie and his siblings lived in fear of their mother.  Pet. Exhs. 8, 9, 14, 15, 17, 18.  Trial counsel engaged the services of an investigator and a psychiatrist.  The psychiatrist noted that Trottie spoke of abandonment by his mother, but denied suffering any physical abuse, contrary to the statements in the affidavits by his relatives.  He acknowledged receiving some

corporal punishment as a child, but stated that he deserved it and did not characterize it as abusive. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless . . ., counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. In this case, counsel presented evidence of Trottie's abandonment by his mother, but Trottie specifically denied that he suffered physical abuse at her hands. Counsel therefore had no reason to pursue any investigation into physical abuse, and was not deficient for failing to do so.

### d.   "Eleventh Hour Investigation"

Trottie points to the timing of counsel's actions in retaining the investigator and expert witness, and sending information to them, to support a claim that counsel failed to investigate until the last minute. He fails, however, to demonstrate how the outcome would have been any different if counsel investigated earlier. The record shows that the expert witness, a psychiatrist, prepared a thorough report and testified that Trottie would not be a future danger in prison because the psychological factors that caused him to murder Barbara and Titus would not be present in prison.

Trottie also points to a note in the prosecutor's file as proof that counsel had not read the file 15 days before trial. Trial counsel, however, states in an affidavit that he obtained discovery and read the file. SH at 187. The prosecution also acknowledged that counsel read the file. Pet. at 29. Trottie does not demonstrate prejudice from the alleged timing of counsel's review.

Trottie also claims that counsel failed to discover information from Patrice Espree that

22

Trottie worked as a security officer and was always armed with a 9mm firearm.  She also stated that she had a relationship with Trottie while he was still seeing Barbara.  It is unclear how this testimony would have helped Trottie, as it shows that he carried a gun of the type used to murder Barbara and Titus, and that he was unfaithful to Barbara.

Trottie also claims that his probation officer, Lynn Clark, could have presented helpful testimony that Trottie was a good probationer, and that Barbara "probably did mess with [Trottie's] head a little."  Pet. Exh. 27.  Clark also said, however, that Trottie was obsessed with Barbara and talked about killing her.  In any event, most of this information came out at trial.  *See* 22 Tr. at 67-81.

Trottie also points to a prosecutor's note regarding one of Trottie's former teachers, Jesse Doyle.  The note stated that Trottie was not a troublemaker in school.  Pet., Exh. 28. The note also states that Trottie had trouble following rules.  Moreover, Doyle testified at trial that Trottie was expelled from school and stole $3,000 worth of band equipment.  22 Tr. at 15-19.  In sum, some of the evidence Trottie now cites was presented, and the rest is either unhelpful or double-edged.  Trottie cannot demonstrate that he was prejudiced by counsel's failure to present this evidence.

### e.      Failure To Rebut Extraneous Offense Evidence

The State presented evidence that Trottie shot at people on two prior occasions. Probation Officer Lynn Clark testified that Trottie told her he was involved in a shootout with another man in 1990.  Trottie said he shot and wounded the man after the man first shot at him.  No charges were filed.  22 Tr. at 74-75.  Frederick Rusk, the father of Barbara's

daughter, testified that Trottie once pulled a gun on him in front of Barbara's house. Rusk heard that Trottie was being rough with his daughter and wanted to talk about it with Trottie. Trottie did not want to talk to Rusk. Rusk went to Barbara's grandmother's house. When he arrived, Trottie got out of a car and fired a gun at Rusk, who was sitting in his car. The shot missed both Rusk and the car. No charges were filed. *Id.* at 109-13.

Trottie now claims that Tonya Baul could have rebutted the evidence of the 1990 shooting. Trottie claims that Tonya's ex-husband, Willie Baul, initiated the shooting. Pet. at 43. He presents affidavits from Tonya Baul and Dwight Ragston, both of whom state that Willie was a troublemaker who was often in conflict with Tonya and Trottie. Pet. Exh. 11 and 12. Baul's affidavit, however, does not mention the shooting. Ragston states that Willie Baul fired first, supporting Trottie's statement to Lynn Clark.

With regard to the other shooting, Trottie presents an affidavit from Hassan Gabriel who claims that Rusk fired first, while Trottie and Gabriel were driving away. Pet. Exh. 10. Gabriel was in jail at the time of Trottie's trial. Moreover, on cross-examination, Rusk admitted that he had a gun in his car and that he followed Barbara and Trottie to her grandmother's house. 22 Tr. at 116-18.

While some of this evidence might have been favorable to Trottie, it is not enough to establish *Strickland* prejudice. The record established the extremely violent nature of Trottie's murder of Barbara and Titus, as well as a fairly extensive criminal record including several gun-related offenses. In assessing *Strickland* prejudice in a capital sentencing hearing, "the question is whether there is a reasonable probability that, absent the errors, the

sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 465 U.S. at 695.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. As the Fifth Circuit succinctly framed this concept: "Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that . . . death was not an appropriate sentence?" *Neal v. Puckett*, 239 F.3d 683, 692 (5th Cir. 2001).

Even if Trottie could have established that he shot only in response to other people firing first, there was ample evidence of past violence and ongoing disregard for the law. Under these circumstances, it is not reasonably probable that the outcome would have been different had the new evidence been presented to the jury.

### f.     Trottie's Clothing

The prosecution pointed to Trottie's dark clothing as evidence that the murders were premeditated.  Trottie now claims that counsel should have called witnesses to testify that he wore dark clothes as his security officer's uniform.  Shirley Baisey, however, testified that Trottie also wore a ski mask.  20 Tr. at 459.  A police officer testified that Trottie's clothes consisted of a black shirt, black jeans, black tennis shoes, white socks, and a black belt.  19 Tr. at 351-52.  The fact that Trottie wore jeans, tennis shoes, and, most significantly, a ski mask, undercuts his claim that this was a uniform.  Finally, whether this was a uniform or not is ultimately irrelevant.  Trottie presents no evidence that he was on his way to or from work. Even if his clothing was his work uniform, this does not mean that he did not make a

conscious decision to wear dark clothing when he went to Barbara's house.  Trottie fails to

demonstrate *Strickland* prejudice regarding his clothing.

### g.    Failure To Address Inconsistencies

Trottie next argues that counsel failed to address several inconsistencies in the State's

case.  First, he argues that counsel failed to point out the possibility that Titus fired the first

shot.  This is simply incorrect.

On cross-examination of one of the investigating police officers, counsel elicited

testimony that two bullets found in the door frame inside the house were fired from straight

ahead, and that this was consistent with someone within the house shooting at a person

entering through the door.   19 Tr. at 263-64.   In closing argument, defense counsel

specifically argued that Titus shot first and that Trottie merely returned fire.  21 Tr. at 17-20.

None of this changes the evidence that Trottie threatened to kill Barbara, entered her house

while armed, and murdered Barbara and Titus.  The evidence is clear that, even if Trottie's

first shots were fired at Titus in self-defense, he then chased Barbara into another room and

shot her 11 times before returning to fire the fatal shots at Titus.  This evidence does not help

Trottie.

Trottie next argues that counsel failed to attack Shirley Baisey's credibility when she

testified that Trottie shot Titus twice from close range.  The pathologist testified that Titus

had one gunshot wound to the back of the head, and it was fired from more than two feet

away.  19 Tr. at 339-41; 20 Tr. at 446-47.  Testimony from both the pathologist and a police

officer stated that Titus had only one gunshot wound to the back of the head.  The jury also

heard the pathologist's testimony that the shot was fired from more than two feet away. Regardless, the evidence established that Trottie fired at least one fatal shot into Titus's head from nearby, and did so after Titus was wounded.  The presence of a gunshot wound to the back of the torso, 19 Tr. at 339-40, supports Baisey's testimony that Trottie fired twice.  A dispute over whether he fired from a few inches away, or 24 inches away, based on the eyewitness testimony of someone who viewed the shooting in the heat of the moment, does not change the fact that Trottie returned to the room and shot Titus.  It was not ineffective for counsel not to highlight the shooting for the jury.

Trottie next claims that counsel failed to impeach Erranda Harris with her police report.  Harris stated in the report that Trottie kicked in the glass in the front storm door. Trottie now contends that several exhibits show glass outside the house, but not inside.  Even if counsel was deficient, this failure did not prejudice Trottie.  First, there was no testimony at trial that Trottie broke the glass.  Regardless of whether Trottie forced his way in, there was ample evidence that he murdered Barbara and Titus.  Moreover, Harris's testimony that Trottie forced his way into the house was corroborated by the testimony of Charlotte Canada. 19 Tr. at 279, 311.  This claim lacks merit.

Finally, Trottie argues that counsel failed to highlight inconsistent testimony about specific details of the crime, including where Barbara was when Trottie entered the house, whether Trottie ordered everyone onto the floor when he entered, the circumstances of Shirley Baisey getting shot, whether Titus ran or crawled into the hallway after getting shot, exactly when he shot Titus, and what he said before firing the final shots at Titus.  Counsel

did, in fact, highlight for the jury that there were discrepancies in the details. *See*, *e.g.*, 21 Tr. at 17-19. In any case, these are *details*. There is no dispute that Trottie fired the fatal shots, and no question of mistaken identity – the eyewitnesses all knew Trottie. It is not at all likely that counsel emphasizing discrepancies in relatively minor details of a fast and traumatic event would have changed the outcome.

### h. Failure To Challenge Jurors Predisposed To A Death Sentence

Trottie contends that counsel failed to challenge jurors who, Trottie claims, were predisposed toward returning a death sentence. He relies on statements by the jurors that they would be more inclined to return a death sentence if convinced that the murders were premeditated or planned. Trottie does not and cannot contend that evidence of planning and premeditation are irrelevant to the issue of future dangerousness. *See*, *e.g.*, *Solomon v. State*, 49 S.W.3d 356, 362-63 (Tex. Crim. App. 2001); *Reese v. State*, 33 S.W.3d 238, 245 (Tex. Crim. App. 2000). Nor does he point to any evidence that any of the jurors did not follow their instructions regarding the sentencing process. *See United States v. Simpson*, 645 F.3d 300, 313 (5th Cir. 2011) (courts presume that jurors follow their instructions). Trottie thus fails to demonstrate prejudice.

### B. *Brady* Violations

Trottie next claims that the State suppressed statements by his former probation officer and Patrice Espree about his relationship with Barbara, and by his former high school principal about Trottie's time in school. A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right

28

to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108 (1976).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).   The question is whether, given the non-disclosures of material evidence, the verdict is less worthy of confidence.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *LaCaze v. Warden Louisiana Correctional Institute for Women*, 645 F.3d 728, 736 (5th Cir. 2011).  In defining the scope of the duty of disclosure, it is no answer that a prosecutor did not have possession of the evidence or that he was unaware of it.  Rather, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  *Kyles*, 514 U.S. at 437.

Trottie did not raise this claim in state court.  Therefore, for the same reasons discussed above, this claim is unexhausted and procedurally defaulted.

Though Trottie makes a conclusory claim that the information was suppressed, and suppression might constitute cause for a procedural default, he makes no showing that the information was actually suppressed.  Trottie's argument for suppression is that he did not discover this information until 2009, when his current counsel researched and prepared this federal petition.  But Trottie makes no showing that appellate or state habeas counsel ever sought the State's file.  There is therefore no reason to believe that this information was not readily available to Trottie throughout his legal proceedings, no evidence of suppression, and no cause for his procedural default.  Default notwithstanding, the lack of evidence of suppression would be fatal to this claim.  *See*, *e.g.*, *Hughes v. Johnson*, 191 F.3d 607, 630

(5th Cir. 1999) (petitioner's speculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim); *Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997) (The state bears no responsibility to direct the defense toward potentially exculpatory evidence that can be discovered through the exercise of reasonable diligence).

Moreover, this evidence is not material. Other witnesses testified about Trottie's relationship with Barbara and his lack of disciplinary problems in school. This evidence is, at best, cumulative.

### C.   <u>Prosecutorial Misconduct</u>

In his final series of claims, Trottie alleges that his trial was infected by prosecutorial misconduct. Specifically, he contends that the prosecutor improperly elicited testimony about taped phone conversations he had with Barbara after the tapes were ruled inadmissible, that the prosecutor elicited false testimony that Trottie was "right on" Titus when he fired the two fatal shots, and that the prosecutor engaged in leading *voir dire* to find a jury predisposed to returning a death sentence.

1.     **Whether Claims Are Unexhausted**

Trottie did not raise the claims about testimony that he was "right on" Titus when he fired the two fatal shots, or that the prosecutor conducted leading *voir dire*, in state court. These claims are therefore unexhausted and procedurally defaulted.

Trottie now contends that the prosecution improperly elicited testimony about tape recorded conversations between Trottie and Barbara in which Trottie allegedly threatened Barbara. Respondent argues that Trottie never claimed in state court that the testimony of two of the witnesses he identifies here, Latrale Lott and Tyshan Baisey, was improper, or that the trial court's response to a jury note asking about the tapes was insufficient to cure any error. Respondent argues that these, too, are unexhausted. Here, however, Trottie did raise the underlying claim that the prosecutor elicited improper testimony about the tapes. While he did not specifically cite to Lott's and Baisey's testimony, their testimony was in the record before the state habeas court. Therefore, this claim, and this evidence, are exhausted.

Trottie also observes that the jury sent a note to the trial judge asking for the tapes. Respondent characterizes this as a separate claim for relief. Trottie, however, does not appear to raise a distinct claim concerning the trial court's response to the jury note. Rather, Trottie's discussion of the court's response seems to be a preemptive argument addressing the contention that any harm caused by improper testimony was cured by the trial court's response. Because this is not a claim for relief or evidence, it is not implicated by exhaustion requirements, and this Court can consider Trottie's argument.

31

## 2.    Testimony Concerning Taped Phone Conversations

The State tried to put tapes of phone conversations between Trottie and Barbara into evidence.  The trial court ruled the tapes inadmissible.  19 Tr. at 379-80.  After the trial court ruled the tapes inadmissible, the prosecutor asked Shirley Baisey, the mother of Barbara and Titus Canada, whether anyone tape recorded a phone conversation between Trottie and Barbara on the night of the murders.  The trial court sustained a defense objection and instructed the jury to disregard the question and answer, but denied a request for a mistrial. SH at 381-82.  A similar exchange occurred during the penalty phase, when the prosecutor asked an expert witness if she would be surprised that the State had hours of tape recorded conversations between Trottie and Barbara.  Again, the trial court sustained a defense objection and instructed the jury to disregard the exchange.

Trottie now argues that a jury note asking for the tapes demonstrates that the instruction was inadequate to cure any error.  Respondent notes that the trial court ruled the tapes inadmissible during a bench conference.  Nothing in the record shows that the judge ever told the jury prior to commencement of the deliberations that the tapes had not been received in evidence.  Respondent argues that the jury note merely reflects the jury's confusion on this issue.  The judge responded to the jury note by informing them that the tapes were not in evidence.

On direct appeal, the TCCA held that any error was cured by the instructions to disregard.  Trottie Appeal Op. at 15-17.  Courts "presume, absent evidence to the contrary, that jurors will follow their instructions." *United States v. Simpson*, 645 F.3d 300, 313 (5th

Cir. 2011).  There is no reason to believe that the jury did otherwise in this case.  The TCCA conclusion is reasonable.

Moreover, "[t]o constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley***,** 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97**,** 108 (1976)).  "'A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)), *cert. dismissed*, 531 U.S. 1134 (2001).  The Fifth Circuit has observed that a "prosecutor's improper [conduct] will, in itself, exceed constitutional limitations in only the most egregious cases." *Menzies v. Procunier*, 743 F.2d 281, 288-89 (5th Cir. 1984).  "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Barrientes*, 221 F.3d at 753 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

Under Fifth Circuit law, this Court must apply a two-step analysis in reviewing claims of prosecutorial misconduct.  *See United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999), *cert. denied*, 529 U.S. 1119 (2000).  First, the Court must determine whether the prosecutor made an improper remark. *Wise*, 221 F.3d at 152.  "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant." *Id.*

33

While the prosecutor clearly referred to, and questioned witnesses about, tapes ruled inadmissible, this conduct does not amount to a due process violation. The point of the tapes presumably was to establish that Trottie had threatened Barbara. Defense counsel quickly objected to the improper questioning, and the trial court gave a curative instruction. Moreover, as discussed above, there was ample evidence that Trottie *did* threaten Barbara, repeatedly, and that the murders resulted from Trottie following through on his threats. In light of this evidence and the trial court's instructions, the prosecutorial misconduct did not affect Trottie's substantial rights. Accordingly, he is not entitled to relief.

### 3. Unexhausted Claims

#### a. Argument Regarding Fatal Shots To Titus

Tyshan and Shirley Baisey testified that Trottie was "right on" Titus when he fired the fatal shots. Pet. at 109. The prosecutor argued that Trottie "sees Titus laying defenseless on the ground but still alive, still breathing, probably dying but still breathing, and he shoots him . . . in the back of the head and probably the back." 21 Tr. at 26. Trottie contends that the prosecutor knew that these statements were refuted by the pathologist's testimony that he was more than 24 inches away when he shot Titus in the head.

As the quote above demonstrates, and contrary to Trottie's characterization, the prosecutor did not argue that Trottie was "right on" Titus when he fired, or that Trottie fired two shots to Titus's head. The prosecutor did not mischaracterize the evidence.

Trottie also notes the following statement:

> But the very, very worst and the reason that this is a death penalty case is because on the way out of the house, when Titus was laying on the ground

34

> incapacitated, no further danger and he could have walked out the door and
> driven to the hospital, Titus is out of the picture, but he stops and says: I
> saved these last two for you. And he executes Titus in front of his own
> mother and in front of his own kids and goes to the hospital.

22 Tr. at 22-23. Trottie contends that this argument is based on information the prosecutor

knew to be wrong.

Under Texas law, a prosecutor may present argument to the jury on four types of

issues: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3)

responses to opposing counsel's argument; and (4) pleas for law enforcement. *Moody v.

State*, 827 S.W.2d 875, 894 (Tex.Crim.App.), *cert. denied sub nom. Moody v Texas*, 506 U.S.

839 (1992).

The portion of the statement quoting Trottie ("I saved these last two for you") is

drawn from the testimony of Shirley Baisey. The rest of the statement is clearly reasonable

deductions from the evidence. Trottie does not identify – in regard to the topics discussed in

this section – any improper comments by the prosecutor.

### b. *Voir Dire*

Finally, Trottie argues that the prosecution conducted improperly leading jury *voir

dire* by telling jurors who were predisposed to returning a death sentence that they had to

consider mitigating evidence. *See*, *e.g.*, 5Tr. at 110 ("And in order for you to qualify as a

juror, you have to be able to honestly tell the Judge: Judge, I will consider any evidence you

bring to me, mitigating, aggravating. I will take it all in"); 7 Tr. at 168 ("[I]n order to qualify

as a juror, you have to be able to consider all mitigating evidence, okay?") Trottie argues that

this "handholding" was intended to make sure that jurors who were predisposed to returning

35

a death sentence qualified to sit on the jury. In fact, the law requires that jurors consider mitigating evidence. *See*, *e.g.*, *Penry v. Johnson*, 532 U.S. 782 (2001). So, in essence, Trottie complains that the prosecutor accurately stated the law to the jurors. Plainly, this claims lacks merit.

### D.   <u>Stay and Abeyance</u>

Trottie asks this Court to stay the case to allow him to return to state court to exhaust unexhausted claims. "Because granting a stay effectively excuses a petitioner's failure to present his claims first to state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277 (2005). As discussed above, Trottie has not demonstrated any cause for his defaults. Moreover, the TCCA would dismiss any new petition raising these claims as an abuse of the writ under Texas law. Therefore, a stay is not appropriate.

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, Trottie fails to raise a viable claim for habeas relief. His claims must be dismissed with prejudice for the reasons stated in this opinion.

### V.   <u>CERTIFICATE OF APPEALABILITY</u>

Trottie has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. *See Alexander*

*v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court

> denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "The nature of the penalty in a capital case is a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945, 949 (5th Cir. 1996) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)), *cert. denied*, 520 U.S. 1122 (1997). However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered each of Trottie's claims. The Court finds that each of the claims is foreclosed by clear, binding precedent. This Court concludes that under such precedents, Trottie has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court concludes that Trottie is not entitled to a certificate of appealability on his claims.

## VI.   CONCLUSION AND ORDER

For the foregoing reasons, it is **ORDERED** as follows:

1.      Respondent Rick Thaler's Motion for Summary Judgment (Doc. # 44) is

        **GRANTED**;

2.      Petitioner Willie Tyrone Trottie's Second Amended Petition for Writ of Habeas

Corpus (Doc. # 33) is in all respects **DENIED**;

3.      Trottie's cross-motion for summary judgment (Doc. # 49) is **DENIED**; and

4.      No certificate of appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Memorandum and Order.

SIGNED at Houston, Texas, this **30th** day of **September, 2011**

_____
Nancy F. Atlas
United States District Judge